**DOCKETED**
JAN 0 6 2005

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE ANDERSEN

# 05CR0009

MAGISTRATE JUDGE ASHMAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. |
| | ) | Violations: Title 18, United |
| ADAM B. RESNICK, | ) | States Code, Sections 371, |
| ANTONETTE M. NAVARRO, and | ) | 657, 1006, 1343, 1344 and 2 |
| TERRENCE M. NAVARRO | ) | |

# FILED

JAN - 5 2005
Jan. 5, 2005
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

## COUNT ONE

The SPECIAL MARCH 2004 GRAND JURY charges:

## BACKGROUND

1.    At times material herein:

a.    Universal Federal Savings Bank ("Universal") was a federal savings bank located at 1800 South Halsted Street, Chicago, Illinois. The deposits of Universal were insured by the Federal Deposit Insurance Corporation. Universal was a small financial institution that began operating in 1923 and that served the needs of residents in the Pilsen community in Chicago from 1923 until it was closed in June 2002.

b.    ANTONETTE M. NAVARRO was the chief operations officer of Universal. As chief operations officer, ANTONETTE NAVARRO was responsible for, among other things, bookkeeping relating to Universal's accounts, and implementing Universal's policies regarding its accounts. She supervised a person who was responsible for handling checks drawn on Universal accounts that were returned for insufficient funds ("NSF checks"). As an employee of Universal, ANTONETTE NAVARRO owed a fiduciary duty to provide honest services to Universal, which among other things, required her to follow Universal's policies.

c.     TERRENCE M. NAVARRO is ANTONETTE NAVARRO's brother. TERRENCE NAVARRO was a Certified Public Accountant who was a principal in the accounting firm of Navarro, Elisco and Associates ("NEA"). NEA opened a checking account at Universal in or about March 2001. TERRANCE NAVARRO was an authorized check signer on the NEA account at Universal.

d.     ADAM B. RESNICK was a business associate and client of TERRENCE NAVARRO. RESNICK was an authorized check signer on the NEA account at Universal.

e.     On January 17, 2002, Universal's board of directors adopted a bank policy regarding the availability to a customer of funds deposited by that customer. The policy stated that, for deposits consisting entirely of local checks, Universal would make available to the depositing customer $100 on the first business day after the day of deposit, with the remainder available on the second business day after the day of deposit. For deposits that included non-local checks, Universal would make available to the depositing customer $100 on the first business day after the day of deposit, with the remainder available on the fifth business day after the day of deposit. The only check deposits for which a customer received same day availability were checks drawn on a Universal account that were deposited in person to one of Universal's employees.

f.     Universal had a checking account at American National Bank and Trust Company of Chicago ("ANB"), the deposits of which were insured by the Federal Deposit Insurance Corporation. Through this account, ANB provided correspondent banking services to Universal. Correspondent banking is a system of relationships among banks that enable funds to be transferred and checks to be paid from one part of the country to another. Community banks, such as Universal, use correspondent banks, like ANB, to make payments to persons with checks drawn on the

2

community bank, to collect on checks drawn on other banks, and to pay their settlement obligations to the Federal Reserve's interbank system based upon these activities. Universal's account at ANB was known as a correspondent account.

      g.    Universal's correspondent account at ANB served several purposes. Among other things, this account was the means by which checks deposited at Universal, and checks drawn on Universal accounts that were presented at other banks, were paid or "cleared." Each business day, Universal deposited into its ANB correspondent account the checks that had been deposited at Universal. ANB credited Universal's correspondent account for the amount of these deposited checks, and then sent the checks to the Federal Reserve for collection. In addition, the Federal Reserve each day sent to ANB electronic information relating to checks drawn on Universal accounts that were presented at other banks. ANB debited Universal's correspondent account at ANB for these amounts, and sent the electronic information regarding these checks to a data processing company called Intrieve, Inc., with which Universal had contracted to help maintain Universal's books and records. Each week, ANB provided Universal with an account statement, which set forth the deposits and withdrawals for Universal's correspondent account. Other than ADAM RESNICK, no other Universal customer was allowed to make check deposits into Universal's correspondent account at ANB.

      h.    Intrieve provided various services to Universal. Among other things, Intrieve received the checks that Universal customers had written on their Universal accounts, copied them, debited the customers' accounts accordingly, prepared monthly account statements, and sent the monthly account statements and copies of the checks to the customer. Intrieve did not automatically provide Universal with copies of the checks that Universal's customers had written on their

3

Universal accounts, but such copies were available to Universal. ANTONETTE NAVARRO's computer at Universal was connected to Intrieve's system, and she could immediately view and print any check drawn on a Universal account – both front and back. In addition, Intrieve provided copies of such checks to Universal upon request.

    i.  Each business day, Intrieve sent to Universal a report that listed each check drawn on a Universal account that was "NSF," meaning that the account had insufficient funds to cover the payment of the check. Intrieve did not automatically provide copies of the NSF checks to Universal, but copies of such checks were available on ANTONETTE NAVARRO's computer and also upon request to Intrieve.

## GENERAL CONSPIRACY ALLEGATIONS

  2.  Beginning in or about December 2001, and continuing thereafter through June 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ADAM B. RESNICK and
ANTONETTE M. NAVARRO,

defendants herein, did conspire and agree with each other to commit offenses against the United States, namely:

    a.  to wilfully misapply funds belonging to Universal and otherwise entrusted to its care, ANTONETTE NAVARRO being an employee of Universal, in violation of Title 18, United States Code, Section 657; and

    b.  to make a false entry in any book, report or statement of or to Universal, with intent to defraud Universal and to deceive the chairman of the board of directors of Universal,

4

ANTONETTE NAVARRO being an employee of Universal, in violation of Title 18, United States Code, Section 1006.

3.     It was part of the conspiracy that, from December 2001 through June 2002, ADAM RESNICK and ANTONETTE NAVARRO agreed to and did wilfully misapply millions of dollars of Universal's funds. Throughout this time period, NAVARRO allowed RESNICK to make check deposits into Universal's correspondent account at ANB at various ANB branches in the Chicagoland area. RESNICK telephoned NAVARRO, or another bank employee supervised by NAVARRO, and told her the total amount of the checks deposited. Without reviewing the checks deposited and in direct violation of Universal's policies relating to the availability of funds, NAVARRO caused the total amount reported by RESNICK to be credited immediately to NEA's account at Universal by means of a journal entry, and made the total amount reported by RESNICK immediately available for the use of RESNICK and the other signers on the NEA account. This allowed RESNICK to engage in a check kite between the NEA account at Universal and Universal's correspondent account at ANB. RESNICK wrote NSF checks on the NEA account, deposited those NSF checks in Universal's correspondent account at ANB, received immediate availability of those funds in NEA's account at Universal, withdrew some or all of the immediately available funds, and then covered the previous NSF checks plus the withdrawn funds by depositing even larger amounts of NSF checks drawn on NEA's Universal account into Universal's correspondent account at ANB. This cycle continued almost daily for more than six months. During the conspiracy, RESNICK made approximately 138 deposits at ANB that included NSF checks drawn on the NEA account, which NSF checks totaled more than $200 million.

4.     It was further part of the conspiracy that, on those occasions when the amount credited to the NEA account exceeded the amount that RESNICK actually deposited into the Universal account at ANB, ANTONETTE NAVARRO concealed the discrepancy for RESNICK. For example, on or about January 23, 2002, NAVARRO caused the NEA account to be credited for approximately $1.54 million, but RESNICK deposited only about $450,000 into Universal's account at ANB. NAVARRO allowed the NEA account to be credited for the full $1.54 million, without charging any interest, until on or about March 30, 2002, when RESNICK made an NSF deposit at ANB that NAVARRO used in part to repay the more than $1 million for which RESNICK had received credit seven weeks earlier. Similarly, on or about March 12, 2002, NAVARRO credited the NEA account for $1.5 million, but RESNICK deposited only $1,238,601 into the account at ANB. NAVARRO allowed the NEA account to be credited for the full $1.5 million, without charging any interest, until on or about May 3, 2002, when RESNICK made an NSF deposit at ANB that NAVARRO used to repay the more than $260,000 for which RESNICK had received credit seven weeks earlier.

5.     It was further part of the conspiracy that RESNICK and ANTONETTE NAVARRO agreed to and did cause to be made false entries in the books and records of Universal for the purpose of deceiving the chairman of the board of directors of Universal. In May or early June 2002, the chairman of Universal, who had been commissioned by Universal's board of directors to investigate the activity in the NEA account, directed ANTONETTE NAVARRO to give him copies of the fronts and backs of checks drawn on the NEA account. In order to conceal the fact that RESNICK had been engaging in a check kite, ANTONETTE NAVARRO and RESNICK agreed that RESNICK would alter the check copies. RESNICK and Terrence Navarro falsified the backs of the

6

check copies to conceal the fact that the checks had been deposited into Universal's correspondent account at ANB. On or about June 20, 2002, ANTONETTE NAVARRO knowingly provided the falsified check copies to the chairman of the bank, thereby allowing the conspiracy to continue. About one week later, ANB discovered the check kite and ended it. The conspiracy caused a total loss in excess of $10 million. As a result, Universal was declared insolvent and was closed.

6.      It was further part of the conspiracy that defendants did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden, acts done in furtherance of the conspiracy and the purpose of those acts.

## OVERT ACTS

7.      In furtherance of and to effect the objects of the conspiracy, one or more of the following acts were committed:

a.      On or about 138 occasions from December 2001 through June 24, 2002, ANTONETTE NAVARRO caused the NEA account at Universal to receive immediate credit and availability for deposits made by RESNICK into Universal's account at ANB, any one of which constitutes an overt act.

b.      On or about June 20, 2002, ANTONETTE NAVARRO gave the chairman of Universal a set of check copies relating to the NEA account.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

The SPECIAL MARCH 2004 GRAND JURY further charges:

1.      The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.      On or about May 3, 2002, in the Northern District of Illinois, Eastern Division,

### ANTONETTE M. NAVARRO,

defendant herein, being an employee of Universal, willfully misapplied money belonging to Universal and intrusted to its care, in that defendant ANTONETTE M. NAVARRO provided immediate credit and immediate availability to the NEA account at Universal for a deposit that defendant ADAM B. RESNICK purportedly made into the Universal account at ANB in the amount of $712,500,

In violation of Title 18, United States Code, Section 657; and

On or about May 7, 2002, in the Northern District of Illinois, Eastern Division,

### ADAM B. RESNICK,

defendant herein, did aid, abet, counsel, command, induce and procure the commission of said offense, by making said deposit,

In violation Title 18, United States Code, Section 2.

8

## COUNT THREE

The SPECIAL MARCH 2004 GRAND JURY further charges:

1.      The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.      On or about June 20, 2002, in the Northern District of Illinois, Eastern Division,

ANTONETTE M. NAVARRO,<br>
ADAM B. RESNICK and<br>
TERRENCE M. NAVARRO,

defendants herein, ANTONETTE M. NAVARRO being an employee of Universal, with intent to defraud Universal and intent to deceive the chairman of the board of directors of Universal, did make and cause to be made a false entry in a book, report and statement of Universal, in that defendant ANTONETTE M. NAVARRO, in connection with an investigation commissioned by the board of directors of Universal, tendered to the chairman of the board of directors of Universal a falsified set of copies of checks relating to the NEA account at Universal, which set of check copies had been falsified by defendants ADAM B. RESNICK and TERRENCE M. NAVARRO,

In violation of Title 18, United States Code, Section 1006 and 2.

## COUNT FOUR

The SPECIAL MARCH 2004 GRAND JURY further charges:

1.      The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.      On or about June 24, 2002, in the Northern District of Illinois, Eastern Division,

### ANTONETTE M. NAVARRO,

defendant herein, being an employee of Universal, willfully misapplied money belonging to Universal and intrusted to its care, in that defendant ANTONETTE M. NAVARRO provided immediate credit and immediate availability to the NEA account at Universal for a deposit that defendant ADAM B. RESNICK made into the Universal account at ANB in the amount of $5,452,000,

In violation of Title 18, United States Code, Section 657; and

On or about June 24, 2002, in the Northern District of Illinois, Eastern Division,

### ADAM B. RESNICK,

defendant herein, did aid, abet, counsel, command, induce and procure the commission of said offense, by making said deposit,

In violation of Title 18, United States Code, Section 2.

## COUNT FIVE

The SPECIAL MARCH 2004 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.     Beginning on or about December 13, 2001, and continuing thereafter until on or about June 25, 2002, in the Northern District of Illinois, Eastern Division, and elsewhere,

ADAM B. RESNICK,

defendant herein, devised, intended to devise, and participated in a scheme to defraud Universal, ANB and certain associates of money and property, which scheme is further described below.

3.     It was part of the scheme that ADAM RESNICK engaged in a check kite between the NEA account at Universal, and Universal's correspondent account at ANB, which caused Universal and ANB to suffer a loss in excess of $10 million. RESNICK and Antonette Navarro agreed that RESNICK would make deposits into Universal's account at ANB and communicate the amounts of the deposit by telephone to Navarro at Universal, and that Navarro would cause the total amount reported by RESNICK to be credited immediately to NEA's account at Universal, and would make the total amount reported by RESNICK immediately available for the use of RESNICK and other signers on the NEA account. RESNICK took advantage of this arrangement to engage in a check kite between the NEA account at Universal and Universal's account at ANB. RESNICK wrote NSF checks on the NEA account, deposited those NSF checks in Universal's correspondent account at ANB, received immediate availability of those funds in NEA's account at Universal, withdrew some or all of the immediately available funds, and then covered the previous NSF checks plus the withdrawn funds by depositing even larger amounts of NSF checks drawn on NEA's Universal's

11

account into Universal's correspondent account at ANB. This cycle continued almost daily for more than six months.

4.     It was further part of the scheme that RESNICK made approximately 138 fraudulent deposits into the Universal account at ANB for the purpose of creating fraudulently inflated balances in the NEA account at Universal. These fraudulent deposits included more than $200 million in NSF checks drawn on the NEA account at Universal. RESNICK used the fraudulently inflated balances in the NEA account to write checks to third parties, and to pay for wire transfers to online gambling businesses and casinos in Hammond, Indiana and Las Vegas, Nevada. Altogether, RESNICK spent approximately $9 million in funds credited to the NEA account on gambling.

5.     It was further part of the scheme that RESNICK provided benefits to Antonette Navarro for the purpose of inducing her to continue their arrangement. Among other things, in March 2002, RESNICK purchased a new BMW for Navarro with an NSF check drawn on the NEA account in the amount of approximately $37,000. In addition, in or about April 2002, RESNICK and Antonette Navarro entered into an agreement by which Navarro agreed to provide unidentified consulting services for one of RESNICK's companies. The agreement called for Navarro to be paid $80,000 per year, in equal monthly installments, plus a $25,000 annual bonus. At that time, Universal was paying Navarro approximately $48,000 per year as a full time employee.

6.     It was further part of the scheme that RESNICK used the fraudulently inflated balances in the NEA account at Universal to engage in a Ponzi scheme. RESNICK told several business associates and their representatives that he was involved in the medical equipment business, and that, if they loaned him money, he would invest their money in his business and repay them substantial amounts of interest in a very short period of time. Based on these representations, several

12

people loaned RESNICK money. RESNICK used the inflated balances in the NEA account to repay these initial investments. Based on these payments, some of the investors again loaned RESNICK money, which was never repaid. Altogether, approximately five investors lost a total of more than $500,000.

7.      It was further part of the scheme that defendant and his co-schemers did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden, acts done in furtherance of the scheme and the purpose of those acts. Among other things, on or about June 20, 2002, RESNICK and Terrence Navarro falsified copies of checks drawn on the NEA account for the purpose of concealing the check kite, and gave those falsified check copies to Antonette Navarro, who provided them to the chairman of the board of Universal, who was investigating the NEA account.

8.      On or about April 11, 2002, at Chicago, in the Northern District of Illinois, Eastern Division,

## ADAM B. RESNICK,

defendant herein, for the purpose of executing the above-described scheme, did cause to be transmitted by means of wire communication in interstate commerce a writing, sign and signal, in that defendant caused $675,000 to be wire transferred from the NEA account at Universal to the account of a Las Vegas casino at a bank in California;

In violation of Title 18, United States Code, Section 1343.

13

## COUNT SIX

The SPECIAL MARCH 2004 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.     Beginning no later than May 2002, and continuing thereafter until on or about June 25, 2002, in the Northern District of Illinois, Eastern Division, and elsewhere,

ANTONETTE M. NAVARRO,

defendant herein, devised and participated in a scheme to defraud Universal, namely a scheme to deprive Universal of its intangible right to receive honest services from its employees, which scheme is further described below.

3.     It was part of the scheme that ANTONETTE NAVARRO knowingly violated Universal policy in connection with the NEA account, thereby placing Universal at substantial risk, and then obstructed an investigation of the NEA account that was commissioned by Universal's board of directors. As a result of NAVARRO's scheme to deprive Universal of her honest services, Universal lost more than $2 million.

4.     It was further part of the scheme that ANTONETTE NAVARRO allowed Adam Resnick to make check deposits into Universal's correspondent account at ANB at various ANB branches in the Chicagoland area. Resnick telephoned NAVARRO and told her the total amount of the checks deposited.  Without reviewing the checks deposited and in direct violation of Universal's policies relating to the availability of funds, NAVARRO caused the total amount reported by Resnick to be credited immediately to NEA's account at Universal by means of a journal entry, and made the total amount reported by Resnick immediately available for the use of Resnick

14

and the other signers on the NEA account. Between December 2001 and June 2002, NAVARRO caused the NEA account to be credited for deposits made by Resnick at ANB on more than 135 occasions, which deposits totaled more than $200 million.

5.     It was further part of the scheme that, at the Universal board meeting on May 16, 2002, in response to questions about the volume of activity in the NEA account, ANTONETTE NAVARRO presented information about NEA and explained that Resnick, an NEA client, was the reason for the increase in activity in the NEA account, but failed to disclose: (1) that she had been providing immediate credit and availability for deposits that Resnick had been making into Universal's account at ANB; (2) that Resnick had purchased a BMW for her; or (3) that Resnick had retained her as a consultant and promised to pay her $105,000 per year. The board directed the chairman to personally investigate the NEA account. The chairman asked for and received copies of several monthly account statements for the NEA account.

6.     It was further part of the scheme that, in response to the chairman's question about the journal entry deposits reflected on the NEA account statements, ANTONETTE NAVARRO falsely and fraudulently stated that they related to manual transactions for deposits that Resnick had made to her personally at Universal, and to corrections for accounting errors. In fact, as NAVARRO well knew, the journal entry deposits had been made to the NEA account because she had been providing immediate credit and availability for deposits that Resnick had been making to the Universal account at ANB.

7.     It was further part of the scheme that, throughout June 2002, when Universal's chairman was seeking more information from Resnick about the activity in the NEA account, ANTONETTE NAVARRO purported to assist in the information collection efforts but failed to

disclose at any time: (1) that she had been giving immediate credit and availability for deposits that Resnick had been making into Universal's account at ANB; (2) that Resnick had purchased a car for her; or (3) that Resnick had retained her as a consultant.

8.  It was further part of the scheme that, in response to the chairman's request in late May or early June 2002 for copies of the checks that had been written on the NEA account, ANTONETTE NAVARRO initially stalled. Then on or about June 13, 2002, NAVARRO provided a set of check copies that showed only the fronts of the checks, which concealed the fact that the checks that had been made payable to "Cash," which was most of the checks in the set, had been deposited into Universal's account at ANB. The chairman requested that NAVARRO provide a set of copies that showed both the fronts and the backs of the checks. On or about June 20, 2002, NAVARRO provided the chairman with a set of check copies that included fraudulently altered backs of the checks that made it appear as if the checks payable to "Cash" had been deposited into accounts other than Universal's account at ANB.

9.  It was further part of the scheme that defendant and her co-schemers did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden, acts done in furtherance of the scheme and the purpose of those acts.

16

10.     On or about June 24, 2002, at Chicago, in the Northern District of Illinois, Eastern Division,

ANTONETTE M. NAVARRO,

defendant herein, for the purpose of executing the above-described scheme, provided immediate credit and immediate availability to the NEA account at Universal for a deposit that Adam Resnick made into the Universal account at ANB in the amount of $5,452,000;

In violation of Title 18, United States Code, Section 1344.

## FORFEITURE ALLEGATION

The SPECIAL MARCH 2004 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference Count One of this Indictment as though fully set forth herein.

2.     Beginning in or about December 2001, and continuing thereafter until in or about June 2002, in the Northern District of Illinois, Eastern Division, and elsewhere,

ADAM B. RESNICK and<br>
ANTONETTE M. NAVARRO,

defendants herein, did engage in a conspiracy to commit violations of Title 18, United States Code, Sections 657 and 1006, thereby subjecting to forfeiture to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), all property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as the result of such violations, including but not limited to at least $10,000,000.

3.     Pursuant to Title 18, United States Code, Section 982(b)(1)(B), and Title 21, United States Code, Section 853(p), if any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants, either:

- cannot be located upon the exercise of due diligence;

- has been transferred or sold to, or deposited with, a third party;

- has been placed beyond the jurisdiction of the Court;

- has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of any other property belonging to the defendants up to the value of the above forfeitable property.

## SENTENCING ALLEGATION – ADAM B. RESNICK

The SPECIAL MARCH 2004 GRAND JURY further charges:

1.      In and during the commission of the conduct alleged in Counts One through Five with which defendant ADAM B. RESNICK is charged, and the relevant conduct to each of those counts:

        a.      The amount of the loss involved was more than $7 million and less than $20 million.  USSG § 1B1.3 and § 2B1.1(b)(1)(K).

        b.      The offense substantially jeopardized the safety and soundness of a financial institution, and the offense affected a financial institution and defendant derived more than $1 million in gross receipts from the offense.  USSG § 1B1.3 and § 2B1.1(b)(12)(A).

19

## SENTENCING ALLEGATION – ANTONETTE M. NAVARRO

The SPECIAL MARCH 2004 GRAND JURY further charges:

1.      In and during the commission of the conduct alleged in Counts One through Four and Six with which defendant ANTONETTE M. NAVARRO is charged, and the relevant conduct to each of those counts:

      a.    The amount of the loss involved was more than $7 million and less than $20 million.  USSG § 1B1.3 and § 2B1.1(b)(1)(K).

      b.    The offense substantially jeopardized the safety and soundness of a financial institution.  USSG § 1B1.3 and § 2B1.1(b)(12)(A).

      c.    Defendant abused a position of private trust in a manner that significantly facilitated the commission and concealment of the offense.  USSG § 1B1.3 and § 3B1.3.


A TRUE BILL:


FOREPERSON


UNITED STATES ATTORNEY

No.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA

vs.

ADAM B. RESNICK,
ANTONETTE M. NAVARRO, and
TERRENCE M. NAVARRO

**I N D I C T M E N T**

Violation(s) : Title 18, United States Code,
Sections 371, 657, 1006, 1343,
1344 and 2

A true bill,

_____
Foreman

Filed in open court this 5 day of January, A.D. 2005

MICHAEL W. DOBBINS
Clerk

Bail, $ _____

RECEIVED
JAN 0 5 2005
MAGISTRATE JUDGE IAN H. LEVIN
UNITED STATES DISTRICT COURT

JAN 0 5 2005