IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff-Petitioner, )<br>)<br>v. )<br>)<br>ADAM B. RESNICK )<br>)<br>Defendant, )<br>)<br>v. )<br>)<br>DOMINIC POETA, )<br>)<br>Third-Party Citation Respondent. ) | No. 05 CR 9-1<br><br>Judge Wayne R. Andersen |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON THE PETITION FOR RELIEF AGAINST DOMINIC POETA

This case is before the court in supplemental proceedings on the United States' amended motion for judgment (Doc. No. 124). On June 6, 2008, the court conducted a bench trial on the amended motion, and then heard closing arguments on June 30, 2008 and July 2, 2008. The court issued its oral ruling on July 23, 2008 after listening to the testimony presented by both parties, reviewing the documents entered into evidence at trial as well as those attached to the amended motion, and hearing the arguments of counsel. For the following reasons and for the reasons stated in open court on July 23, 2008, the motion is granted and judgment will accordingly be entered against Domenic Poeta in the amount of $848,197.63.

# Findings of Fact[1]

To enforce its criminal restitution judgment against Adam Resnick, the United States filed a Petition for Relief in supplemental proceedings (Doc. No. 99)[2] to which Dominic Poeta answered (Doc. No. 110). Some of the facts were established by the pleadings[3] and others at trial.

## The Underlying Criminal Case and Procedural History

1. In January 2005, a six-count indictment was filed in the captioned criminal case against Adam Resnick, and others, charging him with conspiracy to misapply funds; misapplying funds; bank fraud; aiding and abetting, and wire fraud. Resnick appeared and pleaded not guilty to the charges. Doc. No. 13; Petition, ¶ 6.

---

[1] Pursuant to Fed.R.Civ.P. 52(a), the Court sets forth its findings of fact and conclusions of law. Every effort was made here to set out the facts, then the law. However, any conclusion of fact more properly characterized as a conclusion of law, or vice-versa, should be so construed without regard to the section of this opinion in which the conclusion happens to appears. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985). *Accord, e.g., Quela v. Payco-General Am. Creditas, Inc.*, No. 99 C 1904, 2000 WL 656681, at *1 (N.D.Ill. May 18, 2000) (Castillo, J.).

[2] Citations are denoted as follows: (a) to the district court record as "Doc. No." followed by the docket entry number; (b) to the United States' Petition for Relief against Dominic Poeta as "Petition" followed by the paragraph number; and (c) to the June 6, 2008 hearing transcript as "Hrg. Tr." followed by the page number.

[3] To public record-based assertions in the Petition, Poeta did not admit most of the allegations, but merely stated he was "without sufficient knowledge to form a belief as to the truth of the allegations." *See, e.g.*, Answer, ¶ 2. In this circumstance the failure to deny is deemed an admission. *See Shakman v. Democratic Organization of Cook County*, 533 F.2d 344,352 (7th Cir. 1976) (post-judgment contempt petition; affirming court's deeming as admitted respondent's failure to deny notice allegation); *Gilbert v. Johnston*, 127 F.R.D. 145,146 (N.D. Ill. 1989) (not sufficient to state lack of knowledge but lack of knowledge *and* information). Moreover, matters of public record are not susceptible to an answer alleging a lack of knowledge. *Porto Transport, Inc v. Consolidated Diesel Elec Corp*, 20 F.R.D. 1 (S.D.N.Y.1956) (defendant may not assert lack of knowledge or information as to matters of public record). Consequently, the court deems matters of public record to be admitted. The court references alone to the Petition in those cases where Poeta admits the Petition allegations in his Answer or where the court deems them admitted.

2. The indictment alleged that Resnick and his codefendants engaged in a check-kiting scheme by manipulating account balances at Universal Federal Savings Bank, where one of the codefendants worked, and at American National Bank (n/k/a JP Morgan Chase Bank), where Universal had a correspondent account. From about December 2001 to June 2002, the check- kiting scheme allowed Resnick to siphon about $10.2 million from Universal, only a fraction of which was recovered by the government. Resnick gambled away a substantial portion of this money in legal gambling establishments and through use of an illegal bookie The Federal Deposit Insurance Corporation (FDIC) was forced to take over Universal in June 2002, when Universal collapsed upon discovery of and as the direct result of Resnick's check-kiting scheme. Petition, ¶ 7.

3. On July 6, 2006, pursuant to a written plea agreement with the United States, the Resnick withdrew his plea of not guilty and entered a plea of guilty to count five of the indictment alleging wire fraud under 18 U.S.C. § 1343. Doc. No. 61; Petition, ¶ 8.

4. On January 16, 2007, this court sentenced Resnick to 42 months in prison and found him liable for $10.2 million in restitution, of which $9.75 million is owed to the FDIC. Doc. No. 79. The total restitution amount of $10,234,909 was later amended to be $10,457,825. Doc. No. 81.; Petition, ¶ 9.

5. Pursuant to 18 U.S.C. § 3613(c), upon the entry of judgment on January 22, 2007, a lien arose upon all property and rights in property belonging to Adam Resnick.

### Resnick's transfer of $647,000 to Poeta for illegal gambling debts

6. Third-party citation respondent, Dominic Poeta, a/k/a Domenic Poeta, is a resident of Highwood, Illinois and the proprietor of a butcher shop that is also in Highwood, Illinois. Poeta is an acquaintance of Resnick, and, as detailed below, from about August 2001 to June 2002 Poeta

operated as a bookie for defendant and received hundreds of thousands of dollars in illegal wagers from Resnick. Petition, ¶ 3.

7. Resnick met Dominic Poeta around August 2001. Resnick's check-kiting scheme began in December 2001. Also in December 2001, Resnick began paying Poeta money, the source of which was check-kiting scheme proceeds. Petition, ¶ 11; Hrg. Tr. 21, 41-47, 56-57.

8. The following table is a recapitulation of the negotiable instruments Resnick gave to Poeta and which Poeta negotiated to his own benefit:

| Date Paid | No. | Amt. | Payee |
| --- | --- | --- | --- |
| 12/20/01 | 127 | $27,400 | Poeta |
| 1/11/02 | 213949 | $27,400 | Poeta |
| 1/3/02 | 214034 | $15,000 | Poeta |
| 2/14/02 | 247 | $20,000 | Cash |
| 2/25/02 | 258 | $20,000 | Cash |
| 3/4/02 | 264 | $20,000 | Cash |
| 3/8/02 | 273 | $50,000 | Cash |
| 3/22/02 | 294 | $25,000 | Cash |
| 3/25/02 | 305 | $25,000 | Cash |
| 3/28/02 | 339 | $30,000 | Cash |
| 3/30/02 | 214822 | $100,000 | Poeta |
| 3/31/02 | 214825 | $100,000 | Poeta |
| 4/2/02 | 350 | $55,000 | Cash |
| 4/5/02 | 356 | $12,300 | Cash |
| 5/15/02 | 452 | $72,000 | Cash |
| 5/15/02 | 453 | $48,111 | Cash |
| | **Total:** | $647,211 | |

Amended Motion, Ex. F (Chizana Affidavit, Exs. 2, 5, 13); Hrg. Tr. 41-47, 56-57.

9. Resnick made the checks payable to Dominic Poeta or to "cash," and Poeta then negotiated the checks — both those made to himself and to cash — as evidenced by his endorsement on the reverse side of the instrument as well as the deposit records for accounts Poeta maintained at various financial institutions where the instruments were deposited. Amended Motion, Ex. F (Chizana Affidavit, Exs. 2, 5, 13). However, Poeta endorsed one of the checks, written for $48,111,

4

over to Semersky Enterprises, a Highland Park Saab dealership, as payment for a vehicle. *Id.* at Chizana Affidavit, ¶ 5(p). Poeta's Illinois driver's license, bearing his signature, acted as an exemplar and clearly manifested that he endorsed all the instruments. Amended Motion, Ex. F (Chizana Affidavit, Ex. 10)

10. In total, Resnick paid Poeta 647,211. The money is directly traceable to the proceeds of Resnick's check-kiting scheme. Hrg. Tr. 41-47, 56-57.

11. During all times relevant to the Petition, Dominic Poeta, among other things, was a "bookie" — *i.e.*, a person who: accepts illegal wagers on sporting events and other such things, on his own account, his own "book" or on the account of another person. Hrg. Tr. 23-37.

12. The $647,211 Resnick transferred to Poeta was entirely the result of illegal gambling and made either to place illegal wagers or in payment of lost illegal wagers. Hrg. Tr. 56-57.

13. At the time of each transfer detailed above (paragraph 8), Resnick was rendered insolvent and increasingly so. Resnick had few assets of his own. Hrg. Tr. 57-60. With each withdrawal in which he siphoned money from Universal Bank, Resnick became indebted to Universal for the amount of fraud proceeds he obtained. His debt to Universal alone (and not including the several individuals to whom he would later be ordered to pay restitution for separate fraud schemes) — which would later be reduced to a restitution judgment for over $9 million — greatly exceeded his assets from the very first transaction in which he obtained illegal fraud proceeds and then transferred them to Poeta to pay his unlawful gambling debts.

14. At the hearing on the amended motion, Adam Resnick testified for the United States via a video hook-up from his place of incarceration in Littleton, Colorado where he was serving his sentence in the underlying matter. Hrg. Tr. 15-119.

5

15.  Crediting his testimony, Resnick:

- met Poeta in 2001 (Hrg. Tr. 21);

- spoke knowledgeably and factually about his relationship with Poeta including the location and description of Poeta's market in Highwood and his home (*id.* at 22-25);

- identified Poeta as an illegal bookie who maintained his own book, and that testimony was never impeached or contradicted on cross-examination (*Id.* at 23, 64, 113-114, 79-115);

- spoke knowledgeably and candidly about the terms of the gambling that occurred with Poeta including limits, lines, payment and collection of debts (*id.* at 26-29);

- spoke knowledgeably and candidly about the actual illegal gambling that occurred with Poeta (*id.* at 29-37);

- turned to paying Poeta by checks when the losses got too steep; he wrote the checks off the NEA account and via Universal Official Checks funded by the NEA account (*id.* at 32);

- never merely cashed checks with Poeta, and that testimony was never impeached or contradicted on cross-examination (*id.* at 33, 99-106, 109-110);

- bet on his own account and for no one else with few exceptions (*id.* at 33);

- bet with Poeta like he bet with any other illegal bookie he had previously gambled with (*id.* at 34);

- spoke knowledgeably and candidly about how he gained access to the NEA account (*id.* at 38-41);

- spoke knowledgeably and candidly about how he stole $10 million from Universal with the help of his co-defendant who covered the deficits in the NEA account that were resulting from Resnick's compulsive and out-of-control gambling, which included Poeta (*id.* at 41-47);

6

- described as "paltry" his deposits into the NEA account that were not fraud proceeds or gambling proceeds (*id.* at 47);

- clearly indicated that Poeta knew Resnick's money was coming in some irregular way from Universal, and, that testimony was never impeached or contradicted on cross-examination (*id.* at 48-56, 107-108 );

- the checks that are an exhibit to the government's amended motion for judgment he used to pay Dominic Poeta for illegal gambling debts (*id.* at 56-57);

- he was broke in 2001-2002; had recently filed for bankruptcy in Case No. 96 B 34223 protection; and had hundreds of thousands of dollars in debts discharged by the bankruptcy (*id.* at 56-57);

- he is a compulsive gambler (*id.* at 62-66); and

- Poeta was an illegal bookie (*id.* at 64) and was Resnick's bookie in the 2001-02 time-frame (*id.* at 113-114).

15a. Navarro, Elisco & Associates was an accounting firm. Adam Resnick's co-defendant, Terrence M. Navarro, was one of the principals of Navarro, Elisco & Associates and he and his partner, Larry Elisco, allowed Adam Resnick to have signatory rights to the NEA account at Universal. Amended Motion, Ex. E (Chizana Aff. n. 1) and Exhibit C (Plea Agreement), p. 4. Universal Bank had a correspondent account at American National Bank (a/k/a, Bank One). With the help of another codefendant, Universal employee, Toni Navarro, Terrence's sister, Resnick was able to kite checks between Universal's correspondent account and the NEA account with Toni Navarro and others supplying the NEA account with bogus credits and keeping the actual deficits concealed. *Id.*

16. Poeta called as witnesses: Terrence Navarro, Resnick's codefendant (stipulated testimony); Richard McKinley (Hrg. Tr. 126-14), formerly a director and Chairman of Universal's

Board; Lawrence Elisco (Hrg. Tr. 142-168), Terrence Navarro's partner; and Maureen Navarro (Hrg. Tr. 170-187), formerly the President of Universal Bank. Dominic Poeta did not testify.

17. Poeta's witnesses testified about the manner in which Resnick's gained access to the NEA account – which was surely unusual – and how his access to the NEA "account balances" were not lawful. Such testimony supported Poeta's theory that the money stolen from Universal was not, as a legal matter, Resnick's money, and so the government was without standing to recover from Poeta money traceable to Resnick's activity. That legal theory will be addressed below.

18. Resnick knew or should have known at the time of each of the transfers to Poeta that he would face civil and criminal restitution claims in excess of the amounts transferred.

## The Citation Proceedings

19. On April 9, 2007, the United States served a citation to discover assets on Poeta. Petition, ¶ 19.

20. Pursuant to the citation, on August 23, 2007 Poeta appeared with counsel to be examined under oath as to the assets of Adam Resnick. The transcript of the citation examination of Dominic Poeta, partially redacted and without exhibits, was attached as Exhibit 2 to the United States' Petition. Petition, ¶ 20.

21. At the citation examination, and throughout those proceedings, Mr. Poeta consistently invoked his Fifth Amendment right not to be compelled to give testimony that might tend to incriminate him.

22. In his Answer to the United States' Petition for Relief, Poeta:

- admitted only five undeniable allegations; for example, the United States was the plaintiff, and that Poeta was served with a citation, was deposed under oath and had counsel present. Answer, ¶¶ 1, 3, 5, 19 & 20;

8

- denied, for insufficient information 11 allegations, most of which are matters of record in this case and could have been easily discovered and affirmatively answered by him. Answer, ¶¶ 2, 7, 8-11 &14; and

- declined to answer on Fifth Amendment grounds 11 allegations, 9 of which are based on documentary evidence with which Poeta was confronted at his deposition, and at which time he also declined to answer on Fifth Amendment grounds.

## Conclusions of Law

### Jurisdiction

23. Under 18 U.S.C. § 3613(a) the United States may enforce a criminal money judgment according to the practices and procedures for enforcing civil judgments under state law. The court has jurisdiction over Poeta in this post-judgment enforcement proceeding by virtue of a third party citation to discover assets served on the respondent pursuant to Fed. R. Civ. P. 69, which incorporates state post-judgment enforcement procedures, and § 2-1402 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1402) and Illinois Supreme Court Rule 277, which govern citations to discover assets.

24. Entry of judgement against a citation respondent is proper when there is an absence of disputed fact. *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 12221, 1227-28 (7th Cir. 1993). Once the facts are indisputably established, any legal theory, regardless of whether it was asserted in the complaint, can be the basis for the entry of judgment. *Ryan v. Illinois Dept. of Children and Family Services*, 185 F.3d 751, 764 (7th Cir. 1999).

25. The United States advanced two theories of relief in support of Poeta's liability both of which are supported by the facts. The first theory is unjust enrichment. The FDIC (Universal Bank's insurer), as the victim of Resnick's fraudulent scheme, has the superior right to the money Resnick stole and gave to Poeta. Having received crime proceeds and given nothing in return Poeta

9

is certainly in possession of ill-got gains for which principles of unjust enrichment require the imposition of liability. Here, the crime proceeds are traceable directly into Poeta's possession as there was simply no dispute that the balances in the NEA account, from which Poeta was paid were either fictitious credits Resnick's codefendant's applied to the account; proceeds from other frauds Resnick committed; or gambling "winnings" that were funded by prior withdrawals from the NEA account "balances."[4]

26. Under the unique facts of this case, Poeta's liability for unjust enrichment is further supported by Illinois common law which allows victims of theft to trace and recover their money from a bookie. *See McAllister v. Oberne, Hosick & Co.*, 1891 WL 2143, 42 Ill. App 287 (1891) (employer allowed to recover from winner money employee embezzled and lost gambling).[5]

---

[4] The money Resnick paid to Poeta was stolen money, and a thief cannot acquire nor give good title to a subsequent transferee. *Hobson's Truck Sales, Inc. v. Carroll Trucking, Inc.*, 276 N.E.2d 89, 92 (Ill. App. 1971). Poeta cannot claim an exception to this rule, which exists in some circumstances for negotiable instruments where the transferee is a "holder in due course." *Douglas v. Wones*, 458 N.E.2d 514, 519(Ill. App.1983). A holder in due course is one who takes a check for value, in good faith, and without notice of defects (*e.g.*, it is not subject to defenses). 810 ILCS 5/3-302*(a); Coleman v. Heidke*, 684 N.E.2d 163, 166 (Ill. App. 1997). Because Poeta took the sixteen checks from Resnick as payment on an illegal gambling contract (*see infra* ), he cannot be regarded as having taken for value. *Williamsen v. Jernberg*, 240 N.E.2d 758 (Ill. App.1968) (where payment/instrument is promise not to prosecute a crime, consideration is illegal and instrument is void). Consequently, because he cannot claim that he took the checks "for value," Poeta unquestionably came into possession of stolen money, in the form of negotiable instruments, without any defense that he is a "holder in due course."

[5] One article, having surveyed the area, concluded:

> While there is little authority as to the rights of the owner of stolen money as against one who won it from the thief in a gambling transaction, the courts that have considered the problem have generally allowed recovery.

*Rights of Owner of Stolen Money as Against One Who Won it in Gambling Transaction from Thief*, 44 A.L.R. 1242 (1955) (collecting cases).

10

Consequently, principles of unjust enrichment support the imposition of unjust enrichment liability for the $647,211 Resnick paid Poeta.

27. Under its second theory of liability, articulated in its Petition, the United States advances fraudulent transfer claims under the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3001 *et seq.* (FDCPA). In Count I of the Petition, the United States alleges that the transfers from Resnick to Poeta were intentionally fraudulent (under 28 U.S.C. § 3304(b)(1)(A)) and in Count II that they were constructively fraudulent (under 28 U.S.C. § 3304(b)(1)(B)(ii)). It is clear that at the very least the transfers to Poeta worked a constructive fraud on Resnick's creditors.[6]

28. Under the § 3304(b)(1)(B)(ii) of FDCPA, Poeta can be held liable as the recipient of a fraudulent transfer when:

- "the debtor makes the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation;" and

- the debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

*United States v. Moore*, 156 F. Supp.2d 238, 245-46 (D. Conn. 2001) This is a constructively fraudulent transfer and does not require a showing that Resnick, the debtor, made the transfer to

---

[6] Because the court herewith enters judgment on the constructive fraud theory (Count II), it dismisses the intentional fraud theory (Count I) as moot. In Count I, the United States alleged Resnick made the transfers to Poeta "with actual intent to hinder, delay or defraud the United States and Universal Federal Savings inasmuch as Resnick received no legal consideration in exchange from Poeta at the time the transfers occurred; the transfers rendered Resnick insolvent; the transfers were payment of unlawful gambling debts, which, as a matter of law, provides no consideration for a legally enforceable contract; and Resnick, at the time of the transfers, believed or reasonably should have believed that he would incur debts beyond his ability to pay." Petition, Count I, ¶22. The United States proffered evidence clearly and convincingly proving these badges of fraud marking a fraudulent transfer, and thus Count I would be an alternate basis for liability against Poeta.

11

Poeta "with actual intent to hinder, delay or defraud a creditor." 28 U.S.C. § 3304(b)(1)(A) *and compare with* 28 U.S.C. § 3304(b)(1)(B)(ii).

29. Under the FDCPA, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promissor's business to furnish support to the debtor or another person." 28 U.S.C. § 3303(a); *United States v. Vancampen*, 1997 WL 873537, at *4 (D. Kan., Jul 9, 1997).

30. The term "reasonably equivalent value" under the FDCPA has the same meaning under the Bankruptcy Code's fraudulent transfer provision. *Id.* Value means economic value. *Id.* The value of consideration given for a transfer alleged to be in fraud of creditors is determined from the standpoint of creditors. *In re Hinsley*, 201 F.3d 638, 643-44 (5th Cir. 2000). Value is determined as of the date of transfer. *Id.*

31. In Illinois, unauthorized gambling is illegal and a violation of the criminal law. § 28-1(a) of the Illinois Criminal Code of 1961, 720 ILCS 5/28-1(a). To enforce this proscription, the Illinois Criminal Code deems any contract made in "consideration" of illegal gambling " void." § 28-7(a). The Illinois Criminal Code provides:

> "Any obligation void under this Section may be set aside and vacated by any court of competent jurisdiction, upon a complaint filed for that purpose, . . . by any creditor . . . .

§ 28-7(b).[7]

---

[7] The Illinois Criminal Code further authorizes a civil action allowing the gambling "loser" to recover his losses from the "winner," and, if such is not taken within such time, allows any person to bring such an action and to recover three times the proven loss amount from the "winner" §§ 28-8(a) & (b) (The "Loss Recovery Act"). *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997) ("The Loss Recovery Act was intended to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism."); *Zellers v. White*, 70 N.E. 669, 672 (Ill. 1904) (one purpose of the Loss Recovery Act was to prevent gambling and guard against situations where

32. Resnick and Poeta's agreement to engage in gambling created no legal obligation. The checks Resnick gave Poeta were the functional equivalent of just giving away money.

33. The unsanctioned gambling contract between Poeta and Resnick is illegal and unenforceable under Illinois law. An illegal contract is void of consideration and not regarded as providing reasonably equivalent value. *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006) (for fraudulent transfer purposes, services provided to Ponzi-scheme operators did not give "value").

34. The second element of § 3304(b)(1)(B)(ii) is that the debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay." When, as in this case, Resnick's predominant occupation is operating fraudulent schemes and gambling, and his income is solely the result of fraud, the court "may find as a matter of law that the debtor intended to incur debts beyond its ability to repay." *In re Canyon Systems Corp.*, 343 B.R. 615, 650 (Bkrtcy. S.D. Ohio 2006). *See also In re National Liquidators, Inc.*, 232 B.R. 915, 919 (Bkrtcy. S.D. Ohio,1998) (same); *In re Tubman*, 160 B.R. 964, 986-87 (Bkrtcy. S.D. Ohio 1993) (same).

35. Resnick's conduct in fleecing Universal Bank of over $10 million in a matter of months and shows an unmistakable intent to incur debts beyond his ability to pay. He certainly reasonably should have believed that his increasing indebtedness shows that he was not going to be able to meet his obligations as they became due. The fact that he spent stolen proceeds to gamble reinforces this conclusion.

36. In sum, Resnick transferred $647,211 to Poeta without receiving reasonably equivalent value in exchange, because, as a matter of law, the opportunity to illegally gamble

---

the "loser becomes intent on recovering his losses at the gaming table, and is frequently driven to embezzlement and theft."). No claim was brought against Poeta under the Loss Recovery Act.

13

provides no consideration for an enforceable contract, and Resnick intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay, because it was unreasonable to believe he could win back the massive amount of money he was stealing — and simultaneously losing from Poeta and others — from Universal Bank.[8] Poeta is thus liable to the United States under 28 U.S.C. § 3304(b)(1)(B)(ii).

37. In his defense, Poeta attempted to show that Resnick was not the lawful owner of the NEA account, and that he had no lawful authority to transfer money to Poeta. From this he reasoned that the United States, as judgment creditor standing in the shoes of Resnick, had no standing to recover money Poeta received. On this score the court adopts the reasoning set forth in the United States' Motion in Limine (Doc. No. 132).[9] Poeta was paid from either *Universal's* money — in which case the United States can recover on an unjust enrichment theory— or *Resnick's* money — in which case the United States can recover on a fraudulent transfer theory. But in either case, plumbing the precise ownership of the money used or the precise source of the money used would not change the result.

38. Poeta should also be held liable for prejudgment interest. Where an injured party's misappropriated funds are denied the opportunity to grow, restitution should include interest to make

---

[8] Poeta cited *In re Chomakos*, 69 F.3d 769 (6th Cir. 1995) for the proposition that gambling can provide consideration that would defeat a fraudulent transfer claim, but the *Chomakos* case clearly involved licit not illicit gambling and is inapposite. 69 F.3d at 771 ("Where gambling is lawful, as it was in the case at bar, the placing of a bet gives rise to legally enforceable contract rights")

[9] The United States moved to exclude evidence relating to the source of funds deposited into the NEA account. Doc. No. 132. The court took the motion under advisement and never barred the admission of evidence by Poeta. While the court adopts the reasoning of the motion – Poeta's liability does not turn on the precise source or ownership of the NEA funds – the motion is denied as moot.

up for that loss. *See, e.g., Milwaukee v. Cement Division of National Gypsum Co.*, 515 U.S. 189, 195, (1995) ("The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss"); *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1311-35 (7th Cir.1992) (interest should be computed at the rate the defendant would have had to pay for unsecured credit). On such claims as this, Illinois allows prejudgment interest of 5% per year. 815 ILCS 205/2. Prejudgment interest should begin accruing from the date of Poeta's last payment — May 15, 2002[10] — through the date of judgment at $32,360.55 per year. Calculated through July 31, 2008, prejudgment interest totals $200,986.63.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: September 24, 2008

---

[10] Petition, Exhibit F (Chizana Affidavit), ¶ 5(p).